## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| **JAMES C. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.:** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, James C. Williams (hereinafter "Plaintiff" or "Williams") Plaintiff in the
above-referenced action and files this Complaint for Damages showing as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Williams is domiciled in Hinesville, Liberty County, Georgia. At all times
pertinent to this Complaint, Plaintiff was and is a citizen of the state of Georgia.

2.     This Court has jurisdiction over the Plaintiff's claims against the Defendant United
States of America (hereinafter "United States") under the provisions of 28 U.S.C. § 1346; Plaintiff
has satisfied all conditions precedent prior to the filing of this Complaint, including the provisions
of 28 U.S.C. § 2675. Specifically, this claim is against the U.S. Department of Veterans Affairs
(hereinafter "VA") and an administrative claim (Form 95) has been properly filed with the VA and
not acted upon by the VA for six months since filing, thus permitting suit to be filed without final
action on the claim. 28 U.S.C. § 2675.

3.     Defendant United States may be served by mailing process, via certified mail,
return receipt requested, to the United States Attorney General, Attention Civil Division, Civil

Process Clerk, 950 Pennsylvania Avenue, Washington DC 20530-0001, and by personally serving a copy of said process upon the United States Attorneys' Office for the Southern District of Georgia, Honorable Bobby L. Christine, 22 Barnard Street, Suite 300, Savannah, Georgia 31401. A copy of the summons and complaint is also being served via certified mail, return receipt requested to 1) the VA at Dept. of Veterans Affairs, Office of General Counsel 1700 Clairmont Rd., Decatur, Ga. 30030, 2) Office of Chief Counsel VA Regional Office, 3322 West End Avenue, Suite 509, Nashville, Tn. 37203 and 3) U.S. Department of Veterans Affairs, Office of General Counsel, 810 Vermont Avenue Northwest, Washington, DC 20420.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and/or 28 U.S.C. § 1402 (b) because this is the Federal Judicial District wherein a substantial part of the events and/or omissions giving rise to the claim arose and because this is the District wherein the Plaintiff resides.

## FACTS GIVING RISE TO THE COMPLAINT

5.     On 6/19/2017, Plaintiff Williams visited the VA clinic in Savannah, Georgia and saw a primary care physician (Dr. Mendoza-Rodriguez). On this visit, the doctor documented that Mr. Williams left foot and ankle were swollen and that his big toe had a bloody bandage. Mr. Williams told Dr. Mendoza-Rodriguez on this visit that he had a podiatry appointment in a few days at the VA Clinic but was concerned enough that he wanted to come in that day to be checked. Dr. Mendoza-Rodriguez noted an infected wound on the fourth toe with partial skin loss on the first toe of the left foot. She ordered an antibiotic for Mr. Williams.

6.     Mr. Williams next saw VA podiatrist, Dr. Phillip Decubellis, at the Savannah, Ga. VA clinic two days later on 6/21/2017. Dr. Decubellis noted that Williams' was there for evaluation, that his left third toe was infected and that Williams was currently on an antibiotic; however, there is no mention of the left foot pain and swelling that Williams reported two days

2

earlier to Dr. Mendoza-Rodriguez. There is scant detail in Dr. Decubellis of 6/21/2017 and there is no evidence that he did a thorough history and examination, to include addressing the swollen left foot and ankle reported by Mr. Williams two days earlier.

7.      Mr. Williams' previous medical history (which was available to Dr. Decubellis upon inquiry or request) as of the time of this visit show that Williams was a diabetic who had been previously diagnosed with Charcot syndrome of the right foot; however, the only treatment that Dr. Decubellis provided on this visit was to refer Mr. Williams to "outside prosthetics" for custom shoes with plastizote inlays. Dr. Decubellis then scheduled Mr. Williams for a return to the VA podiatry clinic in one year.

8.      Mr. Williams next saw a medical provider named Patel at the Savannah VA Clinic on 7/17/2017. Medical provider Patel noted that the wound on the left foot was improving; however, Mr. Williams told the medical provider on this visit that the neuropathy in his feet was getting worse and that Williams thought he might now be getting Charcot syndrome in his left foot. In this regard, Mr. Williams reported on this visit that he was having numbness in his left foot, particularly in his toes. On this same day (7/17/2017) Williams also saw Dr. Mendoza-Rodriguez again. On this visit Dr. Mendoza-Rodriguez documented that Mr. Williams had "bilateral Charcot deformities of the bilateral foot." Her apparent plan for this condition was to request a vascular doppler to check blood flow to the feet. She also prescribed an antibiotic and noted that a wound care assessment would be requested after the vascular doppler was completed.

9.      The vascular doppler study was done on 7/19/2017. The left upper extremity systolic pressure was 133 and right upper extremity pressure was 128. The left ABI was 0.92 and the right ABI 0.93. The medical records state that these results were within normal limits and it does not appear that any follow up treatment was recommended or requested.

10.     Mr. Williams next went to the VA clinic in Savannah on 08/30/2017. On this visit, Williams saw a VA podiatrist named Stephen Pangborn. Dr. Pangborn note reflects that Mr. Williams was a "new patient" to the clinic; however, this is incorrect based on previous VA records. Dr. Pangborn noted that Mr. Williams had not received his custom shoes with the offloading plastizote inserts that were ordered in June of 2017. Pangborn also noted that Mr. Williams had "bilaterally deformity Charcot arthropathy noted mid foot, limited pain with palpation. Rocker-bottom right foot with plantar prominent boney architecture noted." Despite this documentation, Dr. Pangborn simply reiterated that Mr. Williams needed the custom shoes with the plastizote inserts. Dr. Pangborn's note concludes by stating that Mr. Williams will follow up with Dr. Decubellis for his next scheduled VA podiatry appointment.

11.     On a visit to the Savannah VA clinic dated 09/19/2017, medical provider Patel noted that Mr. Williams left foot wound was healing but that the neuropathy in his feet had gotten worse.

12.     The next note from the Savannah VA clinic is dated 10/12/2017 and it is authored by Dr. Mendoza-Rodriguez. It states that the ABI and doppler of the lower extremities were normal and that the doctor recommended use of compression socks. There is no mention of left foot Charcot syndrome.

13.     Mr. Williams next visited the Savannah VA clinic on 11/27/2017. He saw Dr. Mendoza-Rodriguez again. This note documents Williams had two open areas on the left side of the left foot that were stage 2. The note also documents that pulses were not palpable but that his skin was warm with edema and dry. This note also documents that Williams had dark discoloration to the left lower leg. Dr. Mendoza-Rodriguez referred Williams to wound care and also requested a consult with podiatry in the Charleston VA clinic.

14.     On 12/18/2017, Mr. Williams visited VA podiatrist, Dr. Debbie Byron, at the Charleston South Carolina VA Clinic. On this visit, Dr. Byron noted in the record that the chief complaint was left foot Charcot with ulcer and that the ulcer had been present for about a month. Her plan was to clean and debride the ulcer and order a CROW walker with follow up in three weeks.

15.     Mr. Williams' next visit with Dr. Byron in Charleston was on 01/08/2018. The assessment was again Charcot foot. Dr. Byron also assessed diabetic foot ulceration with midfoot subluxation. The plan was to repeat x-rays and have Williams return to the clinic in two weeks. This note also states that Williams was educated on the need for a CROW walker. Last, this note documents that Byron would begin skin graft applications.

16.     Mr. Williams' next visited with Dr. Byron at the Charleston VA Clinic on 01/29/2018. Dr. Byron noted that he came to this visit wearing the CROW walker. She also noted the ulcer on his foot and documented that the foot was fixed in a pronated, collapsed position. This record does not state which foot she is referring to, but it is assumed that this is the left foot based on previous records. Dr. Byron instructed that Mr. Williams return to her in two weeks for repeat graft applications in an effort to try to heal the left foot ulcer. This note also indicates that Dr. Byron has Mr. Williams on antibiotics; however, it is not clear if he had actually received antibiotics as of that visit date.

17.     Mr. Williams next saw Dr. Byron in the Charleston VA Clinic on 02/06/2018. He again presented wearing the CROW walker. Dr. Byron again noted that his foot was fixed in a pronated, collapsed position. It is again assumed that she is referring to the left foot based on previous records. Dr. Byron noted in this record that the ulcer did not probe to the bone and that there was no exposed bone. The note from this visit does not make it clear that Dr. Byron had Mr. Williams on antibiotics at the time; however, the list of medicines stated that the antibiotics were

"expired." Dr. Byron's plan on this visit was to have Williams come back to the clinic in one week for repeat graft application. There is an addendum on this day by Dr. Byron stating that Mr. Williams called and that the antibiotic had been ordered and released from the pharmacy. This addendum also notes that the skin graft had been ordered for him and that she would phone him once the graft arrived.

18.     On 02/12/2018, Williams again saw Dr. Mendoza-Rodriguez. This note states that his antibiotic was filled on 02/08/2018.

19.     A note in the VA medical records dated 02/20/2018 states that Mr. Williams went to the Liberty Regional Medical Center emergency room in Hinesville, Georgia because his foot infection was worsening. This note also indicates that Mr. Williams had previously called the Charleston VA clinic and was told that Dr. Byron was not available. The Charleston VA clinic then suggested that he attempt to walk-in to the Hinesville, Georgia VA clinic. The note of this date appears to be done by nurses or other medical assistants and not doctors. The note states that Mr. Williams have been getting skin grafts but that they had to order a different kind and that they were still waiting on it to come in. Mr. Williams reported as of this time that the smell coming from the ulcer on his foot was so bad that he could not stand it. This note also states that Mr. Williams had cleaned and dressed the wound himself but that the pain from the foot woke him out of sleep the night before so he came to the Hinesville VA Clinic on 02/20/2018.

20.     When Mr. Williams presented to the Hinesville, Georgia VA Clinic on 02/20/2018, he asked to see Dr. Byron in Charleston; however, he was told that she was out of the office for three days. He then apparently was able to see Dr. Mendoza-Rodriguez. She informed him that he could attempt to do a walk-in at the VA podiatry clinic in Savannah and that as a last resort he could go to the emergency room. Mr. Williams chose to go to the emergency room at the Liberty Regional Medical Center in Hinesville, Georgia.

21.     Mr. Williams arrived at the Liberty Regional Medical emergency room on 02/20/2018. The emergency room records document that he had a severe left foot infection. The clinical impression in the emergency room was acute osteomyelitis of the left foot from a local infection. This was confirmed with x-rays.

22.     The Liberty Regional emergency room physician then transferred Mr. Williams to the Memorial Health University Medical Center in Savannah, Georgia. Mr. Williams was admitted to the Memorial Health University Medical Center and was seen by a surgeon, Dr. Gregory Ellison. Dr. Ellison noted that Mr. Williams had an abscess and osteomyelitis with severe deformity of the left foot. Dr. Ellison recommended a below knee amputation; however, Mr. Williams asked for a second opinion. Thus, Dr. Prather of Chatham Orthopaedics in Savannah, Georgia (a private medical practice) was called in. Dr. Prather saw Mr. Williams and documented that he had a chronic Charcot deformity of the left foot which was causing a prominent "talar head" resulting in medial hind foot ulcer and osteomyelitis. This was confirmed by MRI. Dr. Prather then agreed that, given the extent of the bone infection and the severity of the Charcot deformity, a below the knee amputation was the recommended option. Thus, on 02/23/2018, Dr. Ellison performed a left leg below knee amputation on Mr. Williams.

## COUNT ONE: NEGLIGENCE-
## CLAIM FOR DAMAGES AGAINST DEFENDANT UNITED STATES OF AMERICA

23.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 to 22 above, as if fully set forth herein.

24.     At all times pertinent to this Complaint, the above-referenced VA podiatrists Phillip Decubellis DPM, Steven Pangborn DPM, and Debbie Byron DPM, were agents and employees of the United States Government, Department of Veterans Affairs acting within the course and scope of their employment.

25.     At all times pertinent to this Complaint, the above-named podiatrists, acting within the course and scope of their employment with the United States Department of Veterans Affairs, had a duty to employ that degree of skill and care exercised by physicians generally in similar conditions and like surrounding circumstances in their care and treatment of Mr. Williams.

26.     The above-named VA podiatrists, and each of them, acting within the scope of their employment, negligently breached their duty of care to Mr. Williams and said negligence caused the need for the left leg below knee amputation suffered by Mr. Williams on 2/23/2018. This below knee amputation could have been avoided with proper treatment within the standard of care by one or more of the podiatrists. In this regard, Plaintiff attaches hereto as Exhibit "1", the affidavit of podiatrist Thomas Brosky DPM, which affidavit sets forth acts and/or omissions of the above-named podiatrists which negligently failed to meet the appropriate standard of care, along with a detailed factual basis for said opinions. Dr. Brosky's affidavit is attached for the purposes of complying with O.C.G.A. § 9-11-9.1, or any other statutory or legal requirement to the extent that same are applicable (which Plaintiff denies). This affidavit demonstrates Dr. Brosky's opinions that VA podiatrists Decubellis, Pangborn, and Byron all deviated from the appropriate standard of care in one or more instances during their care and treatment of Plaintiff with respect to their care and treatment of his left foot Charcot deformity and attendant complications, with the result that Mr. Williams had to undergo a left leg below knee amputation on 2/23/2018. As set forth by Dr. Brosky, this amputation could have been avoided with proper treatment within the standard of care by one or more of the podiatrists.

27.     The negligent acts and/or omissions of the above-referenced VA podiatrists that proximately caused the need for the left below knee amputation include, but are not necessary limited to, the following:

a)   On 6/21/2017, Dr. Decubellis negligently failed to meet the appropriate standard of care for

podiatrists by failing to mention the left foot pain and swelling that Williams reported two days earlier to Dr. Mendoza-Rodriguez and the note in general does not reflect a thorough evaluation and treatment plan for the development of Charcot in the left foot. Given Mr. Williams history, Dr. Decubellis negligently failed to diagnose left foot Charcot and negligently failed to initiate an appropriate treatment plan which would have avoided the progression of Charcot in the left foot and ultimately would have avoided the left below knee amputation on 2/23/2018. Proper examination and treatment would have included x-ray orders, MRI or bone scan or at the least non-weight bearing to avoid collapse of the Charcot condition;

b) Likewise, podiatrist Steven Pangborn negligently failed to meet the appropriate standard of care and treatment for Mr. Williams when he saw him on 8/30/2017. Dr. Pangborn's note of this visit states that Mr. Williams had "bilaterally (sic) deformity Charcot arthropathy noted midfoot, limited pain with palpation." Under the heading "Neurological Exam", Dr. Pangborn documented sharp burning pain in Mr. Williams left foot and leg. Based on the above findings, the standard of care required Dr. Pangborn to recognize that Mr. Williams had left foot Charcot and to cast Mr. Williams left foot and place him on strict non-weight bearing of the left foot in order to appropriately treat the left foot Charcot. Had Dr. Pangborn met the standard of care by casting and ordering non-weight bearing, the progression of the left foot Charcot could have been halted and the left below knee amputation could have been avoided;

c) VA podiatrist Debbie Byron also negligently failed to meet the appropriate standard of care. Specifically, on her first visit with Mr. Williams on 12/18/2017, she noted that his chief complaint was left foot Charcot with ulcer and that the ulcer had been present for about a month. Her notes reflect that her plan was to clean and debride the ulcer and order a CROW walker with follow-up in three weeks; however, the appropriate standard of care required Dr. Byron to promptly cast Mr. Williams left foot and order strict non-weight bearing in order to

9

address the clearly documented and worsening deterioration of the left foot Charcot. Further, on Dr. Byron's next visit with Mr. Williams (on 1/8/2018), she again failed to meet the standard of care. On 1/08/2018, x-rays were taken and the radiologist dictated "that destructive changes affecting the talus and the talocalcaneal and talonavicular joints with subluxation of the navicular bone and destructive changes of the talus with diffuse swelling was present." On the visit of 01/18/2018, Dr. Byron only concentrated on the evaluation of the ulcer. There was no mention of this collapse (as described by the x-rays) or clinical examination regarding his Charcot deformity. Since there was no prior workup regarding Mr. Williams' foot collapse except the x-rays performed on 1/8/2018, if Mr. Williams Charcot process was halted at this point by non-weight bearing, further collapse could have potentially been prevented. If Dr. Byron would have evaluated the x-rays that were taken on 01/08/2018 and casted the patient in a non-weight bearing cast, it is more likely than not that the amputation would not have been necessary.

28. As the result of the above-described negligence of the VA podiatrists, Mr. Williams has incurred medical expenses to date in the amount of $71,294.25. Upon information and belief, said bills have been paid by the Defendant, by and through the VA; however, to the extent that any portion of said bills were not paid by the Defendant, Plaintiff would be entitled to recover the amount of such bills from the Defendant.

29. As a result of the above-described negligence of the VA podiatrists, Mr. Williams has endured significant pain and suffering and will continue to experience significant pain and suffering for the rest of his natural life.

WHEREFORE, Plaintiff demands judgment in the amount of ten million dollars ($10,000,000) and seeks relief against the Defendant as follows:

a.) That process issue and summons be served as provided by law;

b.) That judgment be entered against the Defendant for a reasonable sum presenting damages for mental and physical pain and suffering to be determined by the finder of fact in accordance with law;

c.) That judgment be entered against the Defendant for the reasonable value of any medical expenses and other healthcare related expenses, past and future that have not been paid or may not be paid in the future by Defendant. The amount of any such unpaid medical bills to be determined at the appropriate time prior to trial;

d.) That judgment be entered against the Defendant for a reasonable sum representing damages for permanent disability and limitation on Plaintiff's life activities to be determined by the finder of fact in accordance with law;

e.) That Plaintiff such other and further relief as this Court may deem just and appropriate.

Dated: April 30, 2019.

OWENS & MULHERIN

**s/ Joseph Mulherin III**
Joseph A. Mulherin III
Georgia State Bar No. 527910
*Attorney for Plaintiff*

P.O. Box 13368
Savannah, Georgia 31406
T: 912-212-2100
F: 912-691-4724
mulherin@lomlaw.com

STATE OF GEORGIA         )
                                      )

COUNTY OF HALL              )

## AFFIDAVIT

1.

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Thomas A. Brosky, DPM, who, being duly sworn, deposes and states as follows:

2.

My name is Thomas Brosky, DPM. I am over the age of 18 years and am otherwise competent to give this affidavit. I am doctor of podiatric medicine. I have been licensed to practice medicine in the state of Georgia continuously since July of 2000. I am currently engaged in the active practice and teaching of podiatry at the Foot & Ankle Clinic of Oakwood, Inc. in Hall County, Georgia. During the below-referenced time period of July 2017 through February 2018, I had actual professional knowledge and experience in the medical specialty practice of podiatry in which the opinions below are given. This actual professional knowledge and experience was, as of July 2017, and still is, the result of having been regularly and continually engaged in the active practice and teaching of the medical specialty of podiatry for 18 years prior to July 2017 and continuing up to the present time.

3.

As a result of having been in the active practice of podiatry, including the diagnosis and treatment of Charcot's foot for the past 21 years including residency and fellowship, I have gained an appropriate level of knowledge in diagnosing and treating the condition at issue in this matter (i.e., Charcot's foot) which, in my opinion, was negligently diagnosed and treated by the podiatrists identified below. Further, as a result of the professional knowledge and experience

**Exhibit "1"**

described above, I have gained an appropriate level of knowledge with regard to the opinions of medical causation given below. In this regard, a true and correct copy of my Curriculum Vitae is attached hereto and incorporated herein by reference as Exhibit "A."

4.

I give this Affidavit for use by the Plaintiff James Williams in a civil claim for damages against the US Department of Veterans' Affairs and its employees or contractors Phillip D. Decubellis DPM, Steven J. Pangborn DPM, Debbie L. Byron DPM and/or any other persons or entities who would be deemed to be the employers of or otherwise legally responsible under the doctrine of Respondeat Superior for the negligent acts and omissions of the above-named podiatrists. This affidavit is given for the purposes of compliance with the laws of the state of Georgia or for any other purpose allowable or required under the laws of the state of Georgia and/or federal law.

5.

As a result of my above-described podiatric medical training and experience, I am familiar with the standard of care for podiatrists for the care and treatment of patients in similar conditions and like surrounding circumstances as those presented by James Williams when he was a patient at the offices of the US Department of Veterans' Affairs medical clinics in Savannah, Georgia, Hinesville, Georgia and Charleston, South Carolina during the time period of July 2017 through February 2018. As a result of my training and experience as a podiatrist, which experience includes 21 years of treating patients in similar conditions and like surrounding circumstances as those presented by James Williams, as described below. I am specifically familiar with the standard of care for podiatrists generally and particularly for podiatrists with respect to the treatment of a condition known as Charcot foot in similar circumstances and

2

conditions as were presented by James Williams medical condition when he was treated by the above-identified podiatrists between July of 2017 and February of 2018.

6.

In preparation for giving this Affidavit, I have reviewed true and correct copies of the following medical records regarding James Williams:

a) Medical records from Ankle & Foot Associates LLC in Savannah, Georgia;

b) Records from the US Department of Veterans' Affairs clinics in Savannah, Georgia, Hinesville, Georgia and Charleston, South Carolina from January 2013 through February 2018;

c) Records of the Liberty Regional Medical Center in Hinesville, Georgia on February 20, 2018;

d) Records from the Memorial Health University Medical Center in Savannah, Georgia from February 20, 2018 through March 2, 2018.

7.

The opinions below are based upon the information contained in all of the above-identified medical records, as well as my training and experience as a duly licensed podiatrist, to include my experience treating Charcot foot. The following is a summary of pertinent facts based upon the above medical records:

a) On 6/19/2017, Williams visited the VA Clinic in Savannah, Georgia and saw a primary care physician (Dr. Mendoza-Rodriguez). On this visit, the doctor documented that Mr. Williams left foot and ankle were swollen and that his big toe had a bloody bandage. Mr. Williams told Dr. Mendoza-Rodriguez on this visit that he had a podiatry appointment in a few days at the VA Clinic but was concerned enough that he wanted to come in that day

3

to be checked. Dr. Mendoza-Rodriguez noted an infected wound to the fourth toe with partial skin loss of the first toe on the left foot. She started an antibiotic. Mr. Williams then saw a VA podiatrist, Dr. Phillip Decubellis, two days later on 6/21/2017. Dr. Decubellis noted that Williams was there for evaluation and that his left third toe was infected and Williams was currently on an antibiotic; however, there is no mention of the left foot pain and swelling that Williams reported two days earlier to Dr. Mendoza-Rodriguez. There is little detail in Dr. Decubellis note of 6/21/2017 and there is no evidence that he did a thorough history and examination, to include addressing the swollen left foot and ankle reported by Mr. Williams two days earlier to Dr. Mendoza-Rodriguez. Mr. Williams' previous medical history as of this visit showed that he was a diabetic who had been previously diagnosed with Charcot of the right foot. The only treatment that Dr. Decubellis provided on this visit was to refer Mr. Williams to out "outside prosthetics" for custom shoes with plastizote inlays. Dr. Decubellis then scheduled Mr. Williams for a return to the VA podiatry clinic in one year;

b) Mr. Williams next saw a medical provider named Patel at the Savannah VA Clinic on 7/17/2017. Medical provider Patel noted that the wound on the left foot was improving; however, Mr. Williams told medical provider Patel on this visit that the neuropathy in his feet was getting worse and that he "Mr. Williams" thought he maybe now getting Charcot in his left foot. In this regard, Mr. Williams reported on this visit that he was having numbness in his left foot, particularly in his toes. On this same day (7/17/2017), Mr. Williams also saw Dr. Mendoza-Rodriguez. During this visit, Dr. Mendoza-Rodriguez documents that Mr. Williams has "bilateral Charcot deformities of the bilateral foot." Her apparent plan for this was to request a vascular doppler to check blood flow to the feet.

4

She also prescribed an antibiotic and noted that a wound care assessment would be requested after the vascular doppler was completed;

c) The vascular doppler was done on 7/19/2017. The left upper extremity systolic pressure was 133 and the right upper extremity pressure was 128. The left ABI was 0.92 and the right ABI was 0.93. The medical records state that these results were normal and it does not appear that any follow-up treatment was recommended or requested;

d) Mr. Williams next went to the VA clinic in Savannah on 8/30/2017. On this visit, he saw a VA podiatrist named Steven Pangborn. Dr. Pangborn's note reflects that Mr. Williams was a "new patient" to the clinic; however, this is incorrect based on previous records. Dr. Pangborn noted that Mr. Williams had not received his custom shoes with the offloading plastizote inserts that were ordered in June of 2017. This visit also states that Mr. Williams has "bilaterally deformity Charcot arthropathy noted mid foot, limited pain with palpation. Rocker-bottom right foot with plantar prominent boney architecture noted." Despite this documentation, Dr. Pangborn simply reiterates that Mr. Williams needs the custom shoes with the plastizote inserts. Dr. Pangborn's note concludes by stating that Mr. Williams will follow up with Dr. Decubellis for his next scheduled podiatry appointment;

e) On a visit to the Savannah VA clinic dated 09/19/2017, medical provider Patel notes that Mr. Williams left foot wound is healing but that the neuropathy in his feet has gotten worse;

f) The next note from the Savannah clinic is dated 10/12/2017 and is authored by Dr. Mendoza-Rodriguez. It states that ABI and doppler of the lower extremities were normal and that the doctor recommended use of compression socks. There is no mention of left

foot Charcot's;

g) Mr. Williams next visit to the Savannah VA clinic on 11/27/2017. He saw Dr. Mendoza-Rodriguez again. The doctor's note states that Mr. Williams complained that VA doctors knew he had Charcot's but did nothing other than tell him to wear diabetic shoes with inserts. This note also documents Williams had two open areas on the left side of his left foot that were stage 2. The note also documents that pulses were not palpable but that his skin was warm with edema and dry. This note also documents that he had dark discoloration to the left lower leg. Dr. Mendoza-Rodriguez referred Williams to wound care and also requested a consult with podiatry in the Charleston VA clinic since Mr. Williams was expressing concern with the podiatrist treatment in Savannah;

h) On 12/18/2017, Mr. Williams visited podiatrist, Dr. Debbie Byron at the Charleston South Carolina VA clinic. On this visit, Dr. Bryon notes in the record that the chief complaint was left foot Charcot with ulcer and that the ulcer had been present for about a month. Her plan was to clean and debride the ulcer and order a CROW walker with follow-up in three weeks;

i) Mr. Williams' next visit with Dr. Byron was on 01/08/2018. The assessment was again Charcot foot. Dr. Byron also assessed diabetic foot ulceration with midfoot subluxation. The plan was to repeat x-rays and have Williams return to the clinic in two weeks. This note also states that Williams was educated on the need for a CROW walker. Last, this note documents that Byron will begin skin graft application;

j) Mr. Williams next visited with Dr. Byron at the Charleston VA clinic on 01/29/2018. Dr. Byron notes that he came to this visit wearing the CROW walker. She also noted the ulcer on his foot and documented that the foot is fixed in a pronated collapsed position.

This record does not state which foot she is referring to, but it is assumed that it is the left foot based on previous records. Dr. Byron instructed that Mr. Williams to return to her in two weeks for repeat graft application in an effort to try to heal the left foot ulcer. The note also indicates that Dr. Byron has Mr. Williams on antibiotics; however, it is not clear if he had actually received them yet;

k) Mr. Williams next saw Dr. Byron on 02/06/2018. He again presented wearing the CROW walker. Dr. Byron again notes that his foot is fixed in a pronated collapsed position. It is again assumed that she is referring to the left foot based on previous records. Dr. Byron notes in this record that the ulcer does not probe to the bone and that there is no exposed bone. It is still unclear from this note whether or not Dr. Byron had Mr. Williams on antibiotics. Specifically, the list of medicines state that the antibiotics are "expired". Dr. Byron's plan on this visit was to have Mr. Williams come back to the clinic in one week for repeat graft application. There is also an addendum on this day by Dr. Byron stating that Mr. Williams called and that an antibiotic had been ordered and released from the pharmacy. This addendum also notes that the skin graft had been ordered for him and that she will phone him once the graft arrived;

l) On 02/12/2018, Mr. Williams again saw Dr. Mendoza-Rodriguez. This note states that his antibiotic was last filled on 02/08/2018;

m) A note in the VA records dated 02/20/2018 states that Mr. Williams went to the Liberty Regional Medical Center emergency room in Hinesville, Ga. because his foot infection was so bad. This note also indicates that Mr. Williams had previously called the Charleston VA clinic, was told that Dr. Byron was not available and they then suggested that he attempt to walk-in at the Hinesville, Ga VA clinic. The notes of this date appear to

7

be done by nurses or other medical assistants and not doctors. The notes states that Mr. Williams had been getting skin grafts but they had to order a different kind and they were still waiting on them to come in. Mr. Williams reported at this time that the smell coming from the ulcer was so bad that he could not stand it. The note also states that Mr. Williams had cleaned and dressed the wound himself but that the pain from the foot woke him up out of sleep the night before so he came into the Hinesville Clinic on 02/20/2018. Mr. Williams again asked to see Dr. Byron in Charleston; however, he was told that she was out of the office for three days. He then apparently was able to see Dr. Mendoza-Rodriguez who informed him that he could attempt to do a walk in at the VA podiatry clinic in Savannah and that as a last resort he could go to the emergency room. Mr. Williams chose to go to the emergency room at Liberty Regional Medical Center in Hinesville, Ga;

n) Mr. Williams arrived at the Liberty Regional emergency room on 02/20/2018. The emergency room records document that he had a severe left foot infection. The clinical impression in the emergency room was acute osteomyelitis of the left foot from a local infection. This was confirmed with x-rays. Liberty Regional emergency room then transferred Mr. Williams to Memorial Health University Medical Center in Savannah, Ga. Mr. Williams was admitted to Memorial Health University and was seen by a surgeon, Dr. Gregory Ellison. Dr. Ellison noted that Mr. Williams had an abscess and osteomyelitis with severe deformity of the left foot. Dr. Ellison recommended a below knee amputation; however, Mr. Williams wanted a second opinion. Thus, Dr. Prather from Chatham Orthopaedics in Savannah, Ga. was called in. Dr. Prather saw Mr. Williams and documented that he had a chronic Charcot deformity of the left foot which

was causing a prominent "talar head" resulting in medial hind foot ulcer and osteomyelitis. This was confirmed by MRI. Dr. Prather then agreed that, given the extent of the bone infection and the severity of the Charcot deformity, a below the knee amputation was the recommended option. Thus, Dr. Ellison performed a left leg below knee amputation on Mr. Williams on 02/23/2018.

8.

Based on all of the above facts and circumstances, it is my opinion, based on my training and experience as a doctor of podiatric medicine and practitioner of podiatry, that podiatrists Phillip Decubellis, Steven Pangborn, Debbie Byron and the US Department of Veterans' Affairs, to the extent that one or more of the above-identified podiatrists were employees/agents of the VA, negligently failed to employ that degree of skill and care that is employed by podiatrists generally under similar conditions and like surrounding circumstances with respect to the treatment of James Williams in at least the following particulars;

a) On 6/21/2017, Dr. Decubellis saw and evaluated Mr. Williams in the Savannah, Georgia VA clinic. The notes of this visit reflect that under the heading "Chief Complaint", Mr. Williams stated that he was there for evaluation of his feet and that he had Charcot arthropathy. These notes also reflect that Dr. Decubellis was aware of Mr. Williams visit with Dr. Mendoza-Rodriguez two days earlier during which he reported that his left foot and ankle were swollen. Under the heading "Past Medical History" on this visit, Dr. Decubellis notes, among other things, Charcot arthropathy. Despite the above facts and circumstances, the only treatment that Dr. Decubellis provided on this visit was to refer Mr. Williams to outside prosthetics for custom extra depth shoes with plastizote inlays and to schedule Mr. Williams for a return podiatry visit in one year. In my opinion, Dr. Decubellis negligently failed to

9

meet the appropriate standard of care for podiatrists on this visit. There is no mention in his records of the left foot pain and swelling that Williams reported two days earlier to Dr. Mendoza-Rodriguez and the note in general does not reflect a thorough evaluation and treatment plan for the development of Charcot in the left foot. Given Mr. Williams documented history of diabetes, swollen left foot and ankle documented two days earlier, previously resolved Charcot in the right foot and documentation in Dr. Decubellis note on 6/21/2017 of Charcot arthropathy, Dr. Decubellis negligently failed to diagnose left foot Charcot and negligently failed to initiate an appropriate treatment plan which, in my opinion, would have avoided the progression of Charcot in the left foot and ultimately would have avoided the left below knee amputation on 2/23/2018. Dr. Decubellis did not perform a thorough exam concerning the patient's Charcot arthropathy. A typical exam would include evaluation of the extremity regarding swelling, increased temperature of the foot or leg, or any deformity present. It is apparent that two days prior to this visit the patient had seen the primary care physician Dr. Mendoza-Rodriguez and Dr. Mendoza-Rodriguez dictated that the patient is concerned about having Charcot arthropathy in his right foot and maybe in his left foot. Dr. Mendoza-Rodriguez was concerned enough to place him on antibiotics for the potential infection. Two days later on 6/21/2017, Dr. Decubellis never mentioned in his examination about evaluating this condition properly. A proper examination would also include potential x-ray orders, MRI or bone scan or at the least non-weight bearing to avoid collapse of the Charcot condition if it is beginning to occur. Any form of weight bearing whatsoever, even in a CROW walker can still cause collapse of the acute Charcot process. Dr. Decubellis only reported trimming the patient's nails and subsequently recommending a one year follow-up. This treatment follows well below the standard of care for treating

infection or Charcot arthropathy;

b) Likewise, podiatrist Steven Pangborn negligently failed to meet the appropriate standard of care and treatment for Mr. Williams when he saw him on 8/30/2017. First, Dr. Pangborn incorrectly stated that Mr. Williams was a "new patient to the clinic". Dr. Pangborn's note of this visit also states that Mr. Williams had "bilaterally (sic) deformity Charcot arthropathy noted midfoot, limited pain with palpation".  Under the heading "Neurological Exam" Dr. Pangborn documents "sharp burning pain" in Mr. Williams left foot and leg. Based on the above documented findings, the standard of care required Dr. Pangborn to recognize that Mr. Williams had left foot Charcot and to cast Mr. Williams left foot and place him on strict non-weight bearing of the left foot in order to appropriately treat the left foot Charcot. In my opinion, had Dr. Pangborn met the standard of care by casting and ordering non-weight bearing, the progression of the left foot Charcot could have been halted and the left below knee amputation could have been avoided. Here again, Dr. Pangborn did not perform a routine examination to confirm or verify any Charcot condition occurring. His main care was ulcer management and nail care. This definitely falls below the standard of care for any patient with an acute or even a chronic Charcot condition. There was no education on his condition and no Charcot treatment plan was initiated. If Dr. Pangborn would have simply performed a proper subjective examination and an objective evaluation, he   likely would have seen signs of concern regarding Charcot deformity. It has been well documented in the patient's chart that he has seen numerous physicians for his condition prior to Dr. Pangborn. Subsequently, by not examining the patient and documenting his findings properly, it is apparent that the patient continued to ambulate and his Charcot condition continued to cause collapse and further deform. By following the standard of care a proper examination and plan

would have more likely than not saved Mr. Williams foot from an amputation;

c)  Debbie Byron DPM also negligently failed to meet the appropriate standard of care. On her first visit with Mr. Williams on 12/18/2017, she noted that his chief complaint was left foot Charcot with ulcer and that the ulcer had been present for about a month. Her notes reflect that her plan was to clean and debride the ulcer and order a CROW walker with follow-up in three week; however, the appropriate standard of care required Dr. Byron to promptly cast Mr. Williams left foot and order strict non-weight bearing in order to address the clearly documented and worsening deterioration of the left foot Charcot. Further, on Dr. Byron's next visit with Mr. Williams (on 1/8/2018), she again failed to meet the standard of care by failing to Dr. Byron also treated this condition in a manner which was below the standard of care for Charcot deformity. On 1/8/2018, x-rays were taken and the radiologist dictated "that destructive changes affecting the talus and the talocalcaneal and talonavicular joints with subluxation of the navicular bone and destructive changes of the talus with diffuse swelling was present". The radiologist even dictated that these x-rays were evaluated and compared to his last x-rays which were on 3/25/2016. This demonstrates that no radiographic examination was ordered throughout the patient's presentation of acute or even chronic Charcot. This also falls below the standard of care for podiatrists and demonstrates improper treatment.

d).  Dr. Byron saw the patient on this particular date of 1/18/2018, and only concentrated on the evaluation of the ulcer itself. There was no mention of this collapse (as described by the x-rays) or clinical examination regarding his Charcot deformity. Since there was no prior workup regarding Mr. Williams' foot collapse except these current x-rays on 1/8/2018, it can be assumed that if the Charcot process was halted at this point, by non-weight bearing, further collapse could have potentially been prevented. If Dr. Byron would have evaluated

the x-rays as mentioned above, and casted the patient in a non-weight bearing cast, it is more likely than not that an amputation would not have been necessary.

9.

This affidavit is based on information available to me at this time. It is not intended to, nor does it purport to, set forth each and every negligent act and/or omission of Phillip Decubellis DPM, Steven Pangborn DPM, Debbie Byron DPM or their employers, i.e., the Department of Veterans' Affairs, by and through these podiatrists as its agents and employees. The undersigned specifically reserves the right to set forth additional opinions as to additional acts and/or omissions of negligence of the above physicians at a later date.

FURTHER, AFFIANT SAITH NOT.

Executed, this __11__ day of ___SEPT.___, 2018.

Thomas A. Brosky DPM

Sworn to and subscribed before me
this __11__ day of ___Sept___, 2018.

Notary Public
My Commission Expires:
12/14/21

Return to Homepage (/)          Contact Us (/contact-us)    Main Line: 404.501.1000
FOR PHYSICIANS ▾

     EMORY HEALTHCARE | DeKalb Medical

(/)

Search this site

# THOMAS ANTHONY BROSKY , DPM



Podiatric Surgery

## Office Locations

**Foot and Ankle Clinic of Oakwood, Inc.** (primary)
4220 Mundy Mill Place
Suite A
Oakwood, GA 30566
Main Phone: (770) 536-7008
Alternate Phone:
Fax:
Maps & Directions (http://maps.google.com/?q=4220 Mundy Mill Place Suite A Oakwood GA Oakwood)

OVERVIEW

**Specialties**
   Podiatric Surgery

**Certifications**
   Podiatry - 2006

**Education**
   5/23/1997, Ohio College of Podiatric Medicine

**Residency**
   7/1/1999, Mount Sinai Medical Center

**Fellowship**
   7/1/2000, St. Vincent Charity Hospital

**Hospital Affiliations**
   Emory Decatur Hospital

Exhibit "A"